# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| TIFFANY BOND, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Docket No. 1:20-cv-00216-NT |
| | ) |
| MATTHEW DUNLAP, in his official | ) |
| capacity as Secretary of State for the | ) |
| State of Maine; JANET MILLS, in her | ) |
| official capacity as the Governor of the | ) |
| State of Maine; TROY JACKSON, in | ) |
| his official capacity as the President of | ) |
| the Maine Senate; and SARA | ) |
| GIDEON, in her official capacity as | ) |
| the Speaker of the House, | ) |
| | ) |
| Defendants. | ) |

## ORDER ON PLAINTIFF'S EMERGENCY MOTION
## FOR INJUNCTIVE RELIEF

On June 19, 2020, Plaintiff Tiffany Bond[1] filed a Complaint against four state officials—Matthew Dunlap, Maine Secretary of State; Janet Mills, Governor of Maine; Troy Jackson, President of the Maine Senate; and Sara Gideon, Speaker of the Maine House of Representatives (“**the Defendants**” or “**the State**”)—seeking declaratory and injunctive relief preventing enforcement of 21-A M.R.S.A.

---

[1]      Ms. Bond filed this action pro se, but I note that she is an attorney admitted to practice in Maine. Generally, courts treat the submissions of pro se plaintiffs to less stringent standards than formal pleadings drafted by lawyers. *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (A pro se plaintiff's pleadings are held to “less stringent standards than formal pleadings drafted by lawyers.”). Because Ms. Bond prepared and filed her Complaint and emergency motion for injunctive relief, they will not be held to less rigorous standards. *See Barrett v. Lombardi*, 239 F.3d 23, 28 (1st Cir. 2001) (“[N]o such latitude is warranted where, as here, the unrepresented party is himself a lawyer.”).

§§ 353–354. Compl. (ECF No. 1). That statute requires candidates for the United States Senate who are not enrolled in a political party to submit a nomination petition to the Secretary containing the signatures of a minimum of 4,000 registered voters in Maine, certified by local registrars, in order to appear on the Maine general election ballot. 21-A M.R.S.A. § 354(5)(C). On June 29, 2020, Ms. Bond filed an Emergency Motion for Injunctive Relief and Request for Expedited Hearing[2] ("**Pl.'s Mot.**") (ECF No. 11). In her motion, Ms. Bond asks me to reduce the number of signatures required to qualify her to appear on Maine's general election ballot from 4,000 to 2,000. The Defendants oppose the motion.

## FACTUAL AND PROCEDURAL BACKGROUND

Ms. Bond obtained a non-party nomination petition form from Maine's Secretary of State ("**Secretary**") on December 30, 2019, and began collecting signatures on January 1, 2020. Affidavit of Tiffany Bond ("**Bond Aff.**") ¶¶ 7, 9 (ECF No. 11-3); Declaration of Melissa Packard ("**Packard Decl.**") ¶ 16 (ECF No. 16). By March 12, Ms. Bond had gathered approximately 2,500 signatures, but some of the volunteer circulators had not yet taken their oath before a notary, or other qualified person, and none of the signatures had been certified. Bond Aff. ¶¶ 12,16. Due to the

---

[2] Recently, Ms. Bond contacted the Clerk's Office and indicated that she would leave the decision of whether to have a hearing up to me. The State has not requested a hearing or responded to Ms. Bond's request for a hearing. I have reviewed all the affidavits and documentary evidence that Ms. Bond attached to her motion. I have credited all the relevant information submitted by her and there is nothing that needs clarification. Accordingly, I find it unnecessary to have a hearing, and I deny that motion.

public health threat posed by COVID-19, Ms. Bond suspended her own and her campaign workers' signature-gathering efforts on March 12, 2020. Bond Aff. ¶ 14.

## I.    Maine's Response to the COVID-19 Pandemic

The State has taken several steps to respond to the COVID-19 pandemic. Beginning in March, the Governor issued a series of Executive Orders aimed at limiting the size of gatherings. On March 12, the Governor recommended that non-essential large, indoor gatherings of 250 attendees or more be postponed. Declaration of Derek P. Langhauser ("**Langhauser Decl.**") ¶ 12(A)(1) (ECF No. 15). On March 15, the Governor recommended postponing all events with 50 or more people until further notice and all gatherings of more than 10 that included individuals who are at higher risk for severe illness, such as seniors. Langhauser Decl. ¶ 12(A)(1). On March 18, the Governor issued Executive Order 14 FY 19/20, which limited gatherings that are "primarily social, personal, and discretionary events other than employment" to "not more than 10 people." Langhauser Decl. ¶ 12(A)(1). Finally, on May 29, the Governor issued Executive Order 55 FY 19/20, which raised the gathering limit from 10 persons to 50 persons. Langhauser Decl. ¶ 12(A)(1).

The Governor also issued Executive Orders directing Maine residents to stay at home. On March 31, 2020, the Governor issued Executive Order 28 FY 19/20 directing people living in Maine to stay at home unless for essential work, as allowed by Executive Order 19 FY 19/20 and its related interpretive guidance, or for an essential personal activity as allowed by Executive Order 28 and its related interpretive guidance. Langhauser Decl. ¶ 12(B). On April 29, the Governor issued "An Order to Stay Safer at Home," which continued to have Maine people stay at

3

home with the same established exceptions for permitted activities, such as grocery shopping and exercising, but which also allowed Maine people to visit businesses or participate in activities deemed safe to open under Stage 1 of the reopening plan. Executive Order 49 FY 19/20. These activities included barber shops and hair salons, auto dealerships, and drive-in stay-in-your-vehicle religious services that follow COVID-19 Prevention Checklists. *See* Restarting Maine's Economy, https://www.maine.gov/covid19/restartingmaine (last visited July 24, 2020). Executive Order 49 also added the use of cloth face coverings to the list of safety measures. Langhauser Decl. ¶ 12(B)(3). This Order was in effect through May 31, 2020. On May 29, the Governor eased the stay-at-home directives "to the extent that people may access increased business and personal activities that are being reopened." Executive Order 55 FY 19/20.

On April 27, an attorney involved in a people's veto petition asked the Maine Department of Economic and Community Development ("**DECD**")—the lead state agency guiding the State's response to the economic and social impacts of the pandemic—whether signature gathering was considered "essential" and, if so, whether the safety measures and social distancing protocols recommended by the Maine CDC and United States CDC would be adequate to permit signature gathering.[3] Langhauser Decl. ¶¶ 6, 12(B)(2). On May 5, 2020, DECD confirmed to the

---

[3]     The precautionary measures proposed by the people's veto petition attorney included: protective masks and gloves for circulators; single use pens for signatures; hand sanitizer and sanitation products; folding tables to put pens and petitions on with a circulator present to witness the signature; and maintenance of six feet of personal distance between signer and circulator. Circulators would be instructed to deter individuals from congregating at signing locations and actively instruct any signers to maintain proper social distancing protocols per the stricter of Maine CDC and United

attorney that signature gathering for the people's veto referendum petition was a permitted activity under Executive Order 28, and that the proposed safety measures were appropriate. Langhauser Decl. ¶ 12(B)(4); *Portland Press Herald*, "Amid pandemic, GOP gathers signatures to kill ranked-choice voting," https://www.pressherald.com/2020/05/18/amid-pandemic-gop-gathers-signatures-to-kill-ranked-choice-voting/ (last visited July 20, 2020).

On April 8, 2020, the Governor issued Executive Order 37 FY 19/20, permitting remote notarization by video for certain transactions, in response to requests by the Maine State Bar Association and numerous attorneys and judges across the State. Langhauser Decl. ¶ 12(C)(1). However, this Order excepted the administration of oaths to circulators of candidate, initiative, and referendum petitions based on recommendations of the Secretary of State and Attorney General's Offices that the remote notarization process outlined in the Order would not adequately safeguard the integrity of the election process. Langhauser Decl. ¶ 12(C)(2); Packard Decl. ¶ 28.

On April 10, 2020, the Governor issued Executive Order 39 FY 19/20, which postponed the June 14 primary election to July 14, 2020, and expressly extended the deadlines for candidate petition filings from May 25th to June 26th, for submission of petitions to local registrars for certification of individual voter signatures, and from June 1st to July 1st, for filing certified petitions with the Secretary. Packard Decl. ¶ 15; Langhauser Decl. ¶ 13.

---

States CDC social distancing protocols. Declaration of Derek P. Langhauser ("**Langhauser Decl.**") ¶ 12(B)(2) (ECF No. 15).

## II.     Ms. Bond's Efforts to Change Signature Procedures

Ms. Bond attempted to contact the Secretary of State's office on multiple occasions to secure an alternative to the state requirements for ballot access and/or to discuss the notarization process.[4] Bond Aff. ¶ 27. On March 18, 2020, Ms. Bond contacted the Secretary of State's Office to inquire whether any solutions were being floated to the signature requirements; to discuss possible extension of deadlines or acceptance of electronic signatures; and to ask whether notarization was still going to be required. Response Affidavit of Tiffany Bond ("**Bond Resp. Aff.**") ¶ 5 (ECF No. 21-1); Attachment B: Call Transcripts ("**Call Transcripts**") 2–5 (ECF No. 21-3). On April 7, 2020, Ms. Bond contacted the Secretary of State's Office to ask whether any solutions had been implemented and was told that a supervisor would get back to her. Bond Resp. Aff. ¶ 5; Call Transcripts 6–7. On May 5, 2020, Ms. Bond contacted the Secretary of State's Office to inquire whether she was allowed to collect signatures under the Governor's stay-at-home order, and she was told: "[I]f you want to be put on the ballot then you got to get your signatures." Bond Resp. Aff. ¶ 5; Call Transcripts 8. She also questioned how she could get petitions notarized and was told

---

[4]     Ms. Bond contends that she contacted the Secretary of State's office five times—on March 2, March 18, April 7, May 5, and May 6—"to seek a safe, effective, legal, and ethical way to meet the state requirements for ballot access." Affidavit of Tiffany Bond ("**Bond Aff.**") ¶ 27 (ECF No. 11-3). The Defendants contend that neither the Secretary of State nor the Governor's office has any record of communication from Ms. Bond other than the phone call to the Secretary of State's Office on May 6, 2020, and a general constituent email to the Governor also sent on May 6. Langhauser Decl. ¶ 12(C)(3); Declaration of Melissa Packard ("**Packard Decl.**") ¶ 19 (ECF No. 16). Ms. Bond submits transcripts of her calls as attachments to her Reply. Based on those transcripts, I find that Ms. Bond contacted the Secretary of State on March 2, 2020, to ask whether a circulator could have a petition notarized in New Hampshire. Response Affidavit of Tiffany Bond ("**Bond Resp. Aff.**") ¶ 5 (ECF No. 21-1); Attachment B: Call Transcripts ("**Call Transcripts**") 1 (ECF No. 21-3). On the other dates, Ms. Bond did speak with staff in the Secretary of State's Office to discuss possible extensions or alternatives to the in-person signature gathering and notarization requirements.

that a supervisor would get back to her. Call Transcripts 8–9. Finally, on May 6, 2020, Melissa Packard from the Secretary of State's Office contacted Ms. Bond, to discuss the Governor's stay-at-home order. Ms. Packard told Ms. Bond that "there's nothing to stop you" from collecting signatures "as long as . . . you are wearing the mask and the person is willing to sign and . . . you stay six feet away . . . you might want to talk to the Governor's office directly . . . [to] see if that's, they consider that essential. . . ." Bond Resp. Aff. ¶ 5; Call Transcripts 10–11.

In an email message Ms. Bond sent to Ms. Packard later on May 6, 2020, Ms. Bond stated that the in-person signature collection process did not feel "safe or ethical for [her], volunteers, or voters," and Ms. Bond attached an altered petition form that she had developed. Packard Decl. ¶ 17. The proposed form contained no circulator's oath, only a single signature line for one voter to sign, and no space for a registrar's certification. Packard Decl. ¶ 17; Proposed Modified Petition (ECF No. 11-2). Ms. Bond requested permission to email this form to individual voters so that they could print out the form, sign it, and return it on their own. Packard Decl. ¶ 17. Ms. Bond placed a second call to Melissa Packard on March 6, 2020, during which she mentioned that she had sent an email with a proposed form. Bond Resp. Aff. ¶ 5; Call Transcripts 14. Ms. Packard notified Ms. Bond that she would need to run the proposal by her supervisor. Call Transcripts 14. Ms. Bond was later advised that the Secretary had no authority to approve the modified form, or the use of such a procedure, which would be contrary to statute. Packard Decl. ¶ 17.

Ms. Bond attempted to contact the Governor's office by phone on May 6, 2020, but she received a recorded message which stated:

> We are receiving an extremely high volume of calls. We encourage you to visit our website at Maine.gov/DECD before leaving a message. If you visited the website and still have questions, you can email us at businesss.answers@maine.gov.

Call Transcripts 13. Ms. Bond left a message indicating that she wanted to confirm that she could continue to collect signatures under the Governor's Order and requesting a return call. Call Transcripts 13. Ms. Bond then sent an email to the general constituent email system in the Governor's office, with a message indicating that she was "a Senate candidate attempting to finish gathering signatures for ballot qualification and I do not feel safe or ethical doing so under the current Stay at Home Order." Langhauser Decl. ¶ 12(C)(3). Ms. Bond's email further stated that Executive Order 37 FY 19/20, which related to remote notarization, "eliminated the possibility of me finishing collecting by mail [so] I am requesting a one-page sheet that can be emailed, printed, and returned by mail be used. It should not require notary because the intent is for only the individual voter to sign their own name." Langhauser Decl. ¶ 12(C)(3). She concluded the message by asking, "May I please have an email address that I may email a proposed sample to?" Langhauser Decl. ¶ 12(C)(3). The email was forwarded to staff in the Governor's office, who did not respond because they determined that Ms. Bond had an email address to which she could send the form— the same address she was already using to convey her email message. Langhauser Decl. ¶ 12(C)(5). Ms. Bond did not send her form to the Governor's Office. Langhauser Decl. ¶ 12(C)(6).

According to the State, Ms. Bond's May 6th proposal was unworkable in any event—and remains so—because it does not provide the safeguards necessary to protect the integrity of the petitioning process. Packard Decl. ¶ 28. The State also asserts that a scanned pdf of a voter's signature is not an adequate substitute for an original, inked signature and would leave local registrars unable to verify that the signature is that of a registered voter and is not a duplicate or a signature forged by another person. Packard Decl. ¶ 25. Also, according to the State, eliminating the role of the circulator and the notary would remove important safeguards to prevent fraud and forgery in the petition process. Packard Decl. ¶ 24.

## III.   Other Successful Signature Petition Drives

Other non-party candidates running for United States Senate gathered more than the requisite number of signatures during this time period. Max Linn collected 4,636 valid signatures during the period from January 1 until early March. Packard Decl. ¶ 20. Mr. Linn also gathered signatures on 270 more petition forms during the week of June 8–16, 2020, which he had certified by local registrars and filed with the Secretary before the deadline. Packard Decl. ¶ 20. Lisa Savage collected 5,221 valid signatures on March 3rd, the day of the presidential primary election. Packard Decl. ¶ 21; Affidavit of Lisa Savage ("**Savage Aff.**") ¶ 8 (ECF No. 11-9) (candidate and her volunteers gathered 9,000 signatures that day). Ms. Savage filed her petitions with the Secretary on April 9, 2020, which means that she, too, had to get registrars to certify the signatures during the pandemic. Savage Aff. ¶ 10.

In addition, the proponents of a people's veto petition collected over 60,000 signatures of registered voters between February 3 and June 10, 2020. Packard Decl.

¶ 22. Some of those signatures were collected throughout May and early June after the DECD notified the attorney involved in a people's veto petition that signature-gathering was not prohibited under the Governor's Executive Orders. The voters who signed those petitions had to do so in the physical presence of a circulator, and that circulator also had to take an oath in person before a notary. Packard Decl. ¶ 22. The petitions had to be submitted to municipal registrars for certification no later than June 10, 2020—two weeks before the Plaintiff's deadline. Packard Decl. ¶ 22.

## IV.   Timing of this Lawsuit

Ms. Bond waited until June 19, 2020, to bring this action, and she filed her emergency motion seeking injunctive relief on June 29, 2020. Her deadline to submit her petitions to municipalities for review was June 26, 2020. After waiting until after that statutory deadline to file this motion, she has asked this Court for "emergency treatment" and an "expedited hearing." Pl.'s Mot. 1–2.

Ms. Bond named Governor Mills and Secretary Dunlap as defendants because they are "empowered to enforce and administer" Maine election laws. Compl. ¶¶ 11–12, 15. Ms. Bond also included Senate President Jackson and House Speaker Gideon as defendants because they allegedly "had the authority to adjust statutes in response to the pandemic and the State's Legislature was still in session at the beginning of the impact of COVID-19 in Maine," but failed to do so.[5] Compl. ¶¶ 18, 21.

---

[5]     Ms. Bond does not appear to seek any relief directed against Senate President Jackson or Speaker Gideon.

## MAINE'S STATUTORY FRAMEWORK

As previously mentioned, to appear on the Maine general election ballot, a candidate for the United States Senate who is not enrolled in a political party must submit a nomination petition to the Secretary containing the signatures of a minimum of 4,000 registered voters in Maine, certified by local registrars. 21-A M.R.S.A. § 354(5)(C), (7).[6] Any registered voter may sign a non-party candidate's nominating petitions, without regard to the voter's party enrollment status. 21-A M.R.S.A. § 354(2)–(3). The statutory deadline for filing non-party nomination petitions with the Secretary is 5:00 pm on June 1st. 21-A M.R.S.A. § 354(8-A). That deadline was extended until July 1, 2020, pursuant to Executive Order 39 FY 19/20, issued on April 10, 2020.

The Secretary designs the form of the petition and provides forms to candidates upon request, beginning in the December prior to the election year. 21-A M.R.S.A. § 353; Packard Decl. ¶ 8. Both party and non-party candidates are permitted to begin collecting voter signatures on petitions on January 1st of the election year. 21-A M.R.S.A. § 354(6).

The circulator of each nominating petition must verify by oath or affirmation that "the circulator personally witnessed all of the signatures to the petition and that

---

[6]     A candidate seeking the nomination of a political party for the same office must submit petitions containing 2,000 signatures from voters enrolled in that party by March 15th of the election year and then must win the primary. All other requirements for non-party nomination petitions also apply to party candidate petitions. *Compare* 21-A M.R.S.A. §§ 335–336, *with* 21-A M.R.S.A. §§ 354–355. The number of signatures required on candidate petitions has remained constant for over 35 years. *See Stoddard v. Quinn*, 593 F. Supp. 300, 302 (D. Me. 1984). The number of signatures required for a non-party candidate to run for United States Senate now represents only 0.38% of the total number of registered voters in Maine. Packard Decl. ¶ 7.

to the best of the circulator's knowledge and belief each signature is the signature of the person whose name it purports to be." 21-A M.R.S.A. § 354(7)(A). This oath is printed on the petition form, with a signature block for the circulator to sign and date, and for the notary (or other authorized person who administered the oath) to sign and date. Voters must personally sign their names to the petition form "in such a manner as to satisfy the registrar of [his or her] municipality that [he or she] is a registered voter." 21-A M.R.S.A. § 354(3). The voter's name and address must also be printed on the form by either the voter or the circulator. 21-A M.R.S.A. § 354(3)–(4).

Before they are filed with the Secretary, the signed petitions must be submitted to local registrars for review. 21-A M.R.S.A. § 354(7). The statutory deadline for this is May 25th of an election year, but this year, because of the COVID-19 pandemic, it was extended by a month to June 26, 2020. 21-A M.R.S.A. § 354(7)(B); Executive Order 39 FY19/20; Packard Decl. ¶ 15. The local registrar must examine each signature on the petition to determine whether it is of a voter who is registered to vote in that municipality. 21-A M.R.S.A. § 354(7)(C); Packard Decl. ¶ 12. This process typically involves manually checking the Central Voter Registration system and comparing the voter's signature to the voter registration card on file. Packard Decl. ¶ 12. The petition form includes a block next to each signature along the left margin, where the registrar can place a checkmark or code (e.g., "NR" for not registered) to reflect the results of their review. Packard Decl. ¶ 12. At the bottom of the petition form is a space for the municipal registrar to sign and date and indicate

the total number of registered voters who signed that petition form. Packard Decl. ¶ 12.

Once the certified petitions are filed with the Secretary, if the petition "contains the required number of certified names and is properly completed," the Secretary "shall accept and file it." 21-A M.R.S.A. § 356(1). Any registered voter in the electoral district who wishes to contest the validity of a nomination petition must file a challenge by 5:00 pm on the fifth business day after the petition filing deadline, thereby initiating an administrative hearing and judicial review process. 21-A M.R.S.A. § 356(2).

The requirements for original inked signatures by voters and oaths by petition circulators that are administered in person before a notary are designed to ensure the security and integrity of the nomination process. Packard Decl. ¶¶ 23–25. According to the State, detection of fraud and forgery in the nomination process depends upon the ability to examine original, inked signatures. Packard Decl. ¶¶ 23–25. State and local officials would be unable to identify forged signatures if ordered to accept unverified "electronic signatures," as the Plaintiff suggests. Packard Decl. ¶¶ 25–26.

Maintaining the integrity of states' election infrastructure is critically important. Local officials are an integral part of how state and federal elections are administered in Maine, and many communities have very small populations and limited resources. As far as the Secretary's Office is aware, Maine municipalities do not have any technologies in place that would permit voters to sign candidate

petitions electronically in a secure manner as a substitute for original inked signatures, and the Secretary does not consider a scanned pdf of a voter's signature an adequate substitute. Packard Decl. ¶ 26. Moreover, law enforcement agencies, such as the Cybersecurity and Infrastructure Security Agency of the Department of Homeland Security and the U.S. Treasury Financial Crimes Enforcement Network, have cautioned state and local government officials to be wary of opening unsolicited attachments even from known senders. Packard Decl. ¶ 26. Any system providing for the secure electronic transmission of election-related documents would have to be designed by a qualified vendor selected through a competitive bidding process that typically takes several months. Packard Decl. ¶ 27. The system would then have to be subjected to extensive testing to ensure that it operates accurately and reliably— a process that also would take months. Packard Decl. ¶ 27.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A trial court ruling on a motion for a preliminary injunction must consider four factors: (1) "the movant's likelihood of success on the merits;" (2) "whether and to what extent the movant will suffer irreparable harm in the absence of injunctive relief;" (3) "the balance of [relative] hardships, that is, the hardship to the nonmovant if enjoined as opposed to the hardship to the movant if no injunction issues;" and (4) "the effect, if any, that an injunction [or the lack of one] may have on the public interest." *Russomano v. Novo Nordisk Inc.*, 960 F.3d 48, 52 (1st Cir. 2020) (internal quotations omitted). The harm

to the opposing party and weighing of the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The moving party "bears the burden of establishing that these four factors weigh in its favor," *Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006), but the likelihood of success on the merits is the most important. *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).

A mandatory injunction, which requires affirmative action by the non-moving party in advance of trial and thus alters rather than preserves the status quo, "normally should be granted only in those circumstances when the exigencies of the situation demand such relief." *Braintree Labs., Inc. v Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 40–41 (1st Cir. 2010). But the focus remains "on prevention of injury by a proper order, not merely on preservation of the status quo." *Id.* (internal quotations omitted).

## DISCUSSION

The Plaintiff asserts that Maine's requirement that non-party candidates obtain 4,000 signatures violates both her First Amendment and Equal Protection rights.[7] The Plaintiff does not argue that Maine's ballot restrictions are facially unconstitutional. Rather, the Plaintiff launches an as-applied attack against the

---

[7]    A plaintiff asserting these claims through 42 U.S.C. § 1983, as the Plaintiff does here, must prove that the defendant, acting under the color of state law, caused a constitutional injury. Although COVID-19 itself does not constitute state action, Maine's decision to enforce its ballot restrictions is state action, and the reasonableness of such restrictions must be considered against the altered landscape during the pandemic, which includes actions taken by the State in its response. *See Sinner v. Jaeger*, No. 3:20-cv-00076, 2020 WL 3244143, at *4 (D.N.D. June 15, 2020); *Fair Maps Nev. v. Cegavske*, No. 3:20-cv-00271-MMD-WGC, 2020 WL 2798018, at *8 (D. Nev. May 29, 2020).

ballot restrictions, essentially arguing that the requirement that she obtain 4,000 signatures is unconstitutional in the current context of the COVID-19 pandemic. She asks me to reduce the number of signatures required to 2,000.

## I.   Likelihood of Success on the Merits

When a plaintiff challenges a state's imposition of ballot access restrictions, a court must grapple with competing interests. On the one hand, candidate eligibility requirements implicate First and Fourteenth Amendment rights: "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters . . . to cast their votes effectively." *Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983) (internal quotations omitted) (calling these rights "among our most precious freedoms"). On the other hand, states "retain the power to regulate their own elections." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992); *see also* U.S. Const. Art. I, § 4, cl. 1 (delegating to state legislatures the power to prescribe the "[t]imes, [p]laces and [m]anner of holding Elections for Senators and Representatives"). Such regulation ensures that elections are "fair and honest," *Burdick*, 504 U.S. at 433, and prevents "the democratic process from disintegrating into chaos." *Pérez-Guzmán v. Gracia*, 346 F.3d 229, 238 (1st Cir. 2003); *see also Dobson v. Dunlap*, 576 F. Supp. 2d 181, 189 (D. Me. 2008) (explaining that "state regulation of elections enhances the democratic process"). States have a "strong . . . interest in regulating all phases of the electoral process, including ballot access." *Pérez-Guzmán*, 346 F.3d at 238.

With these competing interests in mind, courts review ballot access restrictions "under the sliding scale approach announced by the Supreme Court" in *Anderson* and *Burdick*. *Libertarian Party of N.H. v. Gardner* (*Gardner I*), 638 F.3d 6, 14 (1st Cir.

2011). Under this *Anderson-Burdick* framework, the "rigorousness of [the court's] inquiry . . . depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick*, 504 U.S. at 434. First, the court assesses the "character and magnitude" of the burdens placed on a plaintiff's constitutionally protected rights. *Id.* (quoting *Anderson*, 460 U.S. at 789). Second, the court evaluates the "precise interests put forward by the state as justifications for the burdens." *Gardner I*, 638 F.3d at 14. Regulations that impose "severe" burdens are subject to strict scrutiny—they must be narrowly drawn to advance a compelling state interest. *Id.*; *see also Burdick*, 504 U.S. at 434. At the other end of the spectrum, regulations that impose only "relatively minor" burdens are subject to rational basis review. *Werme v. Merrill*, 84 F.3d 479, 485–86 (1st Cir. 1996); *see also Libertarian Party of N.H. v. Gardner* (*Gardner II*), 843 F.3d 20, 31 (1st Cir. 2016). As for the rest, if the regulation "imposes only reasonable, nondiscriminatory restrictions," the state's "important regulatory interests are generally sufficient to justify the restrictions." *Burdick*, 504 U.S. at 434 (internal quotations omitted); *see also Block v. Mollis*, 618 F. Supp. 2d 142, 149 (D.R.I. 2009) ("[T]he lighter the burden, the more forgiving the scrutiny; the heavier the burden, the more exacting the review.").

## A.    Burden on Plaintiff

The first step of the *Anderson-Burdick* test is to evaluate the burden placed on the Plaintiff. "The hallmark of a severe burden is exclusion or virtual exclusion from the ballot." *Libertarian Party of Ky. v. Grimes*, 835 F. 3d 570, 574 (6th Cir. 2016); *see also Am. Party of Tex. v. White*, 415 U.S. 767, 783 (1974) ("[W]hat is demanded may not be so excessive or impractical as to be in reality a mere device to always, or almost

17

always, exclude parties with significant support from the ballot. The Constitution requires that access to the electorate be real, not merely theoretical.") (internal quotations omitted). "In the end, 'there is no hard-and-fast rule as to when a restriction on ballot eligibility becomes an unconstitutional burden.' " *Garbett v. Herbert*, No. 2:20-CV-245-RJS, 2020 WL 2064101, at \*12 (D. Utah Apr. 29, 2020) (quoting *Utah Republican Party v. Cox*, 892 F.3d 1066, 1086 (10th Cir. 2018)).

The Plaintiff contends that, "[i]n light of the COVID19 pandemic, Maine's 'in person' signature gathering requirements severely burdened" her rights. Pl.'s Mem. of Law in Support of Her Emergency Mot. for Injunctive Relief ("**Pl.'s Mem.**") 6 (ECF No. 11-1). She contends that requiring in-person signature collection means that "only candidates who collect all or most signatures before the pandemic <u>and</u> who are greatly monied or have added benefit of a party structure have been successful in gaining ballot access." Pl.'s Mem. 7 (emphasis in original). The Plaintiff further explains that she "has characteristics that demonstrate the extreme burden that in-person signature collection produces," including that she has two minor children, lives in a zip code with higher COVID-19 rates, and is an essential worker. Pl.'s Mem. 7. The Plaintiff adds that, even if signature collection is "legally and/or physically feasible, . . . it is unlikely that petition circulators would be able to gather signatures because there are fewer people congregating in public places and fewer people likely to open their doors to uninvited strangers seeking to collect signatures on election petitions." Compl. ¶ 75.

Based on these difficulties, the Plaintiff seeks a reduction in the number of signatures required for ballot access. As noted above, the Plaintiff does not assert that the 4,000-signature requirement is facially unconstitutional or always imposes a severe burden. Rather, she contends that the requirement, coupled with the restriction to in-person signature collection, is unconstitutional in light of the COVID-19 pandemic and responsive state orders. The Plaintiff asserts that "Maine's failure to modify the 'in person' signature collection process . . . created a remarkable hurdle to candidates," but she does not appear to request a modification of that "in-person" requirement in her motion. Pl.'s Mem. 6–7. Nor would such a request be effective without a further extension of the deadline, which she also does not request.[8]

Although the target of the Plaintiff's motion is the number of signatures and, relatedly, the in-person signing requirement, I must consider those requirements within the context of Maine's overall scheme for ballot access. *See Lerman v. Bd. of Elections in City of New York*, 232 F.3d 135, 145 (2d Cir. 2000) ("The burden imposed by the challenged regulation is not evaluated in isolation, but within the context of the state's overall scheme of election regulations."). In this election season, that overall scheme includes an extension of the deadline to submit signatures. The Plaintiff acknowledges that the Governor extended the deadline for submission of signatures. Pl.'s Mem. 9. But she concludes that Maine has "failed to modify

---

[8]      For their part, the Defendants contend that Maine municipalities are ill-equipped to accept electronic signatures and that the development of such a system would take months. Defs.' Mem. of Law in Opp'n to Pl.'s Mot. for Preliminary Injunction ("**Defs.' Opp'n**") 5–6 (ECF No. 17); *see also* Pl.'s Response to Defs.' Opp'n to Pl.'s Mot. ("**Pl.'s Reply**") 7 (ECF No. 21) ("[C]onced[ing] that the State of Maine appears thoroughly incapable of implementing any form of online signature collection at present. . . .").

meaningfully the ballot qualification process to address the impact of Covid19." Pl.'s Mem. 9. She does not develop any argument as to why the extension, which included weeks in June as the State was easing restrictions, was not a meaningful modification

The extension certainly lessened the burden imposed by Maine's ballot access scheme. The Plaintiff was given several weeks, after the lifting of the stay-at-home order and as the state was opening up, to collect more signatures.[9] Requiring candidates to collect all 4,000 signatures by the original May 25th deadline might have created a severe burden, and it might also have been a severe burden if Maine's stay-at-home order extended right up until the deadline to collect signatures. *See SawariMedia LLC v. Whitmer*, No. 20-cv-11246, 2020 WL 3097266 (E.D. Mich. June 11, 2020) (stay-at-home order extended up to submission deadline); *Libertarian Party of Ill. v. Pritzker*, No. 20-cv-2112, 2020 WL 1951687, at \*4 (N.D. Ill. Apr. 23, 2020) (problem exacerbated by fact that "the 'window' for gathering such signatures opened at nearly the same time that [the Governor] first imposed [COVID-19] restrictions."). But neither of those scenarios is present here. *See Gottlieb v. Lamont*, No. 3:20-CV-0623 (JCH), 2020 WL 3046205 (D. Conn. June 8, 2020) ("Had the Governor failed to

---

[9]    The Defendants maintain that the Governor's stay-at-home order did not prohibit the solicitation and collection of signatures for ballot petitions. Defs.' Opp'n 7–8. Even if that fact was unclear from the order's text, subsequent guidance—issued nearly two months before the deadline—appears to have confirmed that such activity was allowed. Langhauser Decl. ¶ 12(B)(4). That guidance was discussed in a newspaper article six weeks before the submission deadline. *Portland Press Herald*, "Amid     pandemic,     GOP     gathers     signatures     to     kill     ranked-choice     voting," https://www.pressherald.com/2020/05/18/amid-pandemic-gop-gathers-signatures-to-kill-ranked-choice-voting/ (last visited July 24, 2020). In states where the stay-at-home orders did not prohibit signature collection, courts have been less inclined to find that plaintiffs were severely burdened. *See Thompson v. DeWine*, 959 F.3d 804 (6th Cir. 2020).

modify the election laws during this public health emergency, plaintiffs' claim of severe burden would have had much greater force.").

Given that the extension coincided with the reopening of the State, I cannot conclude that a reasonably diligent[10] candidate would have been virtually excluded from the ballot due to the State's enforcement of its modified access requirements. *See Cooper v. Raffensperger*, 1:20-CV-01312-ELR, 2020 WL 3892454 (N.D. Ga. July 9, 2020) (concluding that plaintiffs were not virtually excluded from ballot where plaintiffs had two months before the onset of COVID-19 to collect signatures, plaintiffs benefitted from a month-long extension, and the state was beginning to reopen); *see also* Defs.' Mem. of Law in Opp'n to Pl.'s Mot. for Preliminary Injunction ("**Defs.' Opp'n**") 11 (ECF No. 17) (noting that proponents of people's referendum obtained over 60,000 voter signatures between February and June); Packard Decl. ¶ 22 (stating that hundreds of signatures for referendum were collected in one week in June). Thus, based on the record before me, although the Plaintiff faced a non-trivial burden in her attempts to get on the ballot, the Plaintiff has failed to show that she is likely to succeed in claiming that the burden imposed by Maine's ballot

---

[10]    The Defendants suggest that the Plaintiff herself was not diligent in collecting signatures. *See* Defs.' Opp'n 2. As the First Circuit has made clear, the issue is not whether the Plaintiff herself lacked diligence. *Pérez-Guzmán v. Gracia*, 346 F.3d 229, 242–43 (1st Cir. 2003) (rejecting the argument that "only those who demonstrate due diligence can mount a First Amendment challenge to a ballot access requirement"). Rather, the question is whether the State's ballot restrictions are severely burdensome to a reasonably diligent candidate. In a case often referenced in this context, the Supreme Court remanded for further factfinding as to whether, "in the context of California politics . . . a reasonably diligent independent candidate [could] be expected to satisfy the signature requirements" imposed by a state statute. *Storer v. Brown*, 415 U.S. 724, 742 (1974). Thus, the remand "went to the burdensomeness of the challenged regulation (i.e., its severity), not to causation." *Pérez-Guzmán*, 346 F.3d 242–43. "While a particular plaintiff's '[p]ast experience' can have evidentiary significance in an assessment of severity, . . . a showing of personal due diligence is not an element of a ballot access claim." *Id.*

requirements was severe. *See Gottlieb*, 2020 WL 3046205, at *7; *Whitfield v. Thurston*, No. 4:20-cv-00466-KGB2020, 2020 WL 3451692, at *21 (E.D. Ark. June 24, 2020).

## B.    State's Interest

Next, I consider the importance of the State's interests furthered by the ballot access requirements. The Defendants identify several such interests. First, the petitioning process ensures "that candidates have demonstrated a modicum of support to qualify for the ballot, thereby reducing the possibility of vote splitting and voter confusion, and ensuring that elections are fair and orderly." Defs.' Opp'n 5. Second, the "wet" signature and in-person certification requirements "ensure the security and integrity of the nomination process," and the Defendants emphasize that "[d]etection of fraud and forgery in the nomination process depends upon the ability to examine original, inked signatures." Defs.' Opp'n 5 (adding that "State and local officials would be unable to identify forged signatures if ordered to accept unverified "electronic signatures," as plaintiff suggests"); *see also* Packard Decl. ¶¶ 24–26. For her part, the Plaintiff asserts that there was "no justifiable countervailing government interest" furthered by the State's ballot qualification process and that there is "no valid state interest in requiring 'in-person' signature collection" during the COVID-19 pandemic. Pl.'s Mem. 1, 8–9. In her Reply, the Plaintiff dismisses the Defendants' interest in preventing vote splitting as "mooted" in light of ranked choice voting and asserts that any potential fraud is "extraordinarily rare." Pl.'s Response to Defs.' Opp'n to Pl.'s Mot. ("**Pl.'s Reply**") 1, 10 (ECF No. 21).

The Supreme Court has stated—and courts have repeatedly affirmed—that there is "an important state interest in requiring some preliminary showing of a significant modicum of support" before printing a candidate's name on a ballot. *Jenness v. Fortson*, 403 U.S. 431, 442 (1971). Courts have repeatedly held that this showing of support and other state interests are compelling. *See Munro v. Socialist Workers Party*, 479 U.S. 189, 194 (1986) (reaffirming that a state's "interest in preserving the integrity of the electoral process and in regulating the number of candidates on the ballot [is] compelling"); *Gardner II*, 843 F.3d at 32 (citing *Libertarian Party of Me. v. Diamond*, 992 F.2d 365, 371 (1st Cir. 1993) (endorsing state interest in "avoiding overloaded ballots and frivolous candidacies, which diminish victory margins, contribute to the cost of conducting elections, confuse and frustrate voters, increase the need for burdensome runoffs, and may ultimately discourage voter participation in the electoral process")); *Constitutional Party of Virginia v. Virginia State Bd. of Elections*, No. 3:20-cv-349, 2020 WL 4001087, at *6 (E.D. Va. July 15, 2020) (holding that state's restrictions—requiring a minimum number of signatures, requiring the witnessing of signatures, and imposing a deadline—served "compelling" interests of ensuring candidates had sufficient support, protecting against voter fraud, and giving the state enough time to verify signatures); *Fair Maps Nevada v. Cegavske*, No. 3:20-cv-00271-MMD-WGC, 2020 WL 2798018, at *17 (D. Nev. May 29, 2020) (declining to alter state's in-person signature requirement because it was "narrowly tailored to serve the compelling government interest of preventing fraud").

The State has identified compelling interests served by its ballot access scheme. The numerical signature requirement addresses the well-recognized government interest in ensuring that candidates have obtained sufficient support before their names appear on the ballot. The specifications for signature collection and submission are aimed at reducing fraud and protecting the integrity of the election process, threats which are not merely hypothetical. The State identifies several recent instances in which fraudulent signatures were detected, adding that the in-person and "wet" signature requirements enable local registrars to "to verify that the signature is that of a registered voter and is not a duplicate or a signature forged by another person." Packard Decl. ¶¶ 24–25 (explaining that in the last election cycle, an independent candidate submitted petition with "multiple examples of forgery, including signatures of dead people, signatures of people who testified that they did not sign a petition, signatures that a handwriting expert determined were forged, and signatures that did not match those individuals' signatures on the voter registration cards on file with local election officials"); *see also John Doe No. 1 v. Reed*, 561 U.S. 186, 197 (2010) ("The State's interest is particularly strong with respect to efforts to root out fraud, which not only may produce fraudulent outcomes, but has a systemic effect as well: It drives honest citizens out of the democratic process and breeds distrust of our government.") (internal quotations omitted).

The State "undoubtedly ha[s] an interest in the statutory scheme [it] enact[s]" under its constitutional authority. *See Libertarian Party of Conn. v. Merrill*, No. 3:20-CV-0467 (JCH), 2020 WL 3526922, at *14 (D. Conn. June 27, 2020) (citing *Hunter v.*

*Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 243 (6th Cir. 2011) ("States . . . have a strong interest in their ability to enforce state election law requirements.")). The Maine Legislature enacted these requirements to protect these interests, and courts have upheld them in the past. *Libertarian Party of Me. v. Dunlap*, 659 F. Supp. 2d 215 (D. Me. 2009). COVID-19 has not altered the significance of the State's interests.

### C.    Weighing the Plaintiff's Burden against the State's Interests

In the last stage of the *Anderson-Burdick* test, I must consider whether the State's ballot access restrictions are properly tailored to meet its asserted interests. Because I determined that the Plaintiff failed to show that the burden is severe, the State's restrictions survive scrutiny if they are "reasonable" and "nondiscriminatory" means of achieving the State's interests of ballot clarity and election security.[11] I conclude that they are.

In normal times, the State's ballot requirements have been deemed constitutional. *See Libertarian Party of Me. v. Dunlap*, 659 F. Supp. 2d 215 (D. Me. 2009) (upholding Maine's ballot access scheme and rejecting challenge to requirement

---

[11]    Even if the burden on the Plaintiff were severe, the Plaintiff has failed to show that she is likely to succeed. As noted, the State's interests are compelling. And the State's extension of the deadline to submit signatures demonstrates that it adjusted its requirement to the particular COVID-19 context, in a way that it concluded still served those compelling interests. Moreover, requiring the Plaintiff to obtain the same number of signatures as a party candidate is not necessarily a less restrictive means of achieving the State's interests. Party candidates and non-party candidates face different requirements, beyond just the number of signatures, and in some ways the requirements for party candidates are even more burdensome. Party candidates must collect 2,000 signatures from a smaller pool of eligible voters (namely those registered to that party), submit those signatures for verification months earlier, and then win a primary election. 21-A M.R.S.A. §§ 331, 335. Thus, I cannot conclude that simply requiring that non-party candidates collect 2,000 signatures from all registered voters, without any of the other hurdles imposed on party candidates, is a less restrictive means of achieving the same state interests.  In other words, the fact that party candidates need to collect fewer signatures does not mean that the State's requirements for non-party candidates are not narrowly tailored.

that non-party candidates must certify nomination petitions with municipal registrars at least one week before filing with Secretary of State). Recognizing the unique difficulties in this election year, the State has modified its requirements by extending the deadline, which suggests that it has tailored its requirement—and thus the burden on candidates—to the COVID-19 context. This extension reasonably accounts for the period of time when signature collection was less feasible and when it may have been unclear if signature collection was permitted under the stay-at-home order.

Importantly, although the Plaintiff was over a thousand signatures short by the deadline, she does not request any further extension.[12] Rather, she asks a federal court to reduce the number of signatures required by state statute. But the Plaintiff develops no argument as to how halving the number of required signatures would still meet the important state interest of ensuring that candidates on the ballot have shown a "significant modicum of support." *See Jenness*, 403 U.S. at 442. She suggests that she has obtained sufficient support because she collected more signatures than is required for party candidates. Compl. ¶ 78.[13] This argument falls short. To be

---

[12]     The Plaintiff does not appear to argue that any further extension of the signature submission deadline would sufficiently lower the burden, as the only relief she seeks is a reduction of the signature requirement. I decline to alter the State's ballot qualification process in a way not requested by the Plaintiff. *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1206 (2020) (staying injunction in which district court granted "extraordinary" relief not requested by plaintiffs).

[13]     Ms. Bond also notes that she "has previously received 16,552 votes in a federal election," and she asserts, without support, that "[i]t can be reasonably inferred that at least a quarter of prior voters would sign a nomination petition for Plaintiff." Pl.'s Reply 10. But such a conclusion is too speculative, as voter preferences and priorities "change over time." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2503 (2019) ("Voters elect individual candidates in individual districts, and their selections depend on the issues that matter to them, the quality of the candidates, the tone of the candidates' campaigns, the performance of an incumbent, national events or local issues that drive voter turnout, and other

placed on the general election ballot, party candidates must collect 2,000 signatures from voters registered with that party by March 15 and then must win their party's primary. 21-A M.R.S.A. § 335.

As Defendants point out, 4,000 signatures represent only 0.38 percent of the registered voters in Maine. Defs.' Opp'n 3 n.1; Packard Decl. ¶ 7. This number was chosen by the Legislature 35 years ago as necessary to constitute a sufficient modicum of support for a candidate to appear on the ballot, and it has not increased since. *See Common Sense Party v. Padilla*, No. 2:20-cv-01091-MCE-EFB, 2020 WL 3491041, at *7 (E.D. Cal. June 26, 2020) (explaining that it was "unquestionable" that state had interest in regulating ballot access and that reducing the number of signatures would "subvert these compelling state interests"). Moreover, this number is lower than percentages required by other state ballot schemes, including those that have survived challenges in the COVID-19 context. *See Whitfield*, 2020 WL 3451692, at *19–22 (rejecting motion to modify state's requirement that independent candidates for statewide office obtain signatures from 0.58 percent of registered voters); *Libertarian Party of Conn.*, 2020 WL 3526922, at *2–3 (declining to reduce number of required signatures for unaffiliated and minor party candidates where state had lowered the threshold to 5,250 signatures or signatures from .70 percent of actual voters from the previous election); *see also Common Sense Party*, 2020 WL 3491041, at *7 (declining to grant request to reduce number of required signatures,

---

considerations."). The number of votes Ms. Bond received in a different year while running for a different office says little about the support she has obtained for her desired place on this year's ballot.

27

which currently represented 0.33 percent of total voters, and explaining that to do so "would wholly subvert . . . compelling state interests") (internal quotations omitted).

The Plaintiff points out that other states have altered ballot access requirements in response to the COVID-19 pandemic. Pl.'s Mem. 10 (citing changes in Florida, New Jersey, Utah, Minnesota, Michigan, Massachusetts, Rhode Island, and Vermont). However, in most of the examples she provides, the changes were made by state officials and legislatures, rather than through a federal court injunction holding the prior restrictions unconstitutional. In cases where federal courts have granted injunctive relief this election cycle, the facts surrounding the states' stay-at-home orders and ballot restrictions are distinguishable in three ways.

First, in some cases, the courts emphasized that the applicable stay-at-home order prohibited signature collection. *See Esshaki v. Whitmer* (*Esshaki I*), 2:20-CV-10831-TGB, 2020 WL 1910154, at *2–3 (E.D. Mich. Apr. 20, 2020) (noting that signature collection was a misdemeanor offense under stay-at-home order).[14] The

---

[14]    In *Esshaki*, the district court enjoined Michigan from enforcing its ballot access requirements, concluding that the plaintiff was virtually excluded from the ballot and that the state's restrictions were not narrowly tailored. *Esshaki v. Whitmer* (*Esshaki I*), 2:20-CV-10831-TGB, 2020 WL 1910154, at *6–7 (E.D. Mich. Apr. 20, 2020), *aff'd in part and rev'd in part Esshaki v. Whitmer* (*Esshaki II*), –– – F. App'x ––––, 2020 WL 2185553 (6th Cir. May 5, 2020). As noted, in that case, the stay-at-home order extended past the signature submission deadline and did not exempt campaign activity, thus making it a misdemeanor offense to collect signatures. *Id.* at *2–3. Moreover, the state only proposed a deadline extension of eight days, and it was unclear whether the stay-at-home order would be lifted before that new deadline.

    Importantly, the Sixth Circuit stayed part of the injunction on appeal, concluding that the district court lacked authority to dictate the specific modifications the state must implement. *Esshaki II*, 2020 WL 2185553, at *2. The Sixth Circuit upheld the portion of the district court's ruling that enjoined the state from enforcing its ballot restrictions, but "instruct[ed] the State to select its own adjustments so as to reduce the burden on ballot access, narrow the restrictions to align with its interest, and thereby render the application of the ballot-access provisions constitutional under the circumstances." *Id.*; *see also Thompson*, 959 F.3d at 812 ("The broader point is that the federal Constitution provides States—not federal judges—the ability to choose among many permissible options when designing elections. And because that's where the decision-making authority is, federal

28

Defendants maintain that Maine's order did not prohibit such activity, a point that DECD clarified on May 5 and that was discussed in a newspaper article on May 18. Defs.' Opp'n 7–9; Langhauser Decl. ¶ 12(B)(4); *Portland Press Herald*, "Amid pandemic, GOP gathers signatures to kill ranked-choice voting," https://www.pressherald.com/2020/05/18/amid-pandemic-gop-gathers-signatures-to-kill-ranked-choice-voting/ (last visited July 24, 2020); *see also Thompson v. DeWine*, 959 F.3d 804 (6th Cir. 2020) (Ohio stay-at-home order permitted signature collection); *Hawkins v. DeWine*, No. 2:20-CV-2781, 2020 WL 3448228 (S.D. Ohio June 24, 2020) (same).

Second, courts have considered the timing of the signature submission deadline to be important. Courts have modified ballot access requirements in cases where the stay-at-home order extended up to and beyond the deadline, and at least one court suggested that an extension of the deadline would be sufficient. *Esshaki I*, 2020 WL 1910154 at *2–3 (stay-at-home order extended past deadline); *SawariMedia*, 2020 WL 3097266, at *15 n.22 ("If . . . Defendants believe that they could not alter the requirement under the Michigan Constitution concerning the minimum number of signatures in support of a ballot initiative, they could extend the statutory deadline for the filing of the petitions containing those signatures."). Candidates in Maine had several weeks—after the lifting of the stay-at-home order and as restrictions were relaxed—to collect signatures. *See Thompson*, 959 F.3d at

courts don't lightly tamper with election regulations. These concerns are magnified here where the new election procedures proffered by Plaintiffs threaten to take the state into unchartered waters.").

810 (denying injunctive relief in part because state was beginning to open up before deadline); *Libertarian Party of Conn.*, 2020 WL 3526922, at *9 (rejecting argument that in-person petitioning remained unfeasible, noting that "the state ha[d] begun the process of reopening").

Finally, courts have been less inclined to issue injunctions where the state proactively altered its requirements—such as Maine has done by extending the deadline. *See Libertarian Party of Conn.*, 2020 WL 3526922, at *9, *15 (declining to grant injunction where state had extended the deadline by two days, eliminated in-person signatures, and reduced the number of signatures required to .70 percent of the number of voters in the previous election or 5,250 signatures, whichever was less); *Murray v. Cuomo*, No. 1:20-cv-03571-MKV, 2020 WL 2521449, at *12 (S.D.N.Y. May 18, 2020) (declining to grant injunction where state proactively altered ballot access measures by shortening the period to collect signatures but also cutting the number of signatures required).

In fact, the Plaintiff identifies no case in which a federal court granted the relief she seeks in a comparable context. In some cases where courts did alter ballot requirements, the state defendants had consented to or not opposed the changes. *See Cooper*, 2020 WL 3892454, at *9 n.9 (explaining that defendant did not oppose reduction in number of signatures required); *Libertarian Party of Ill.*, 2020 WL 1951687, at *4 (defendants "acknowledged that the ballot access restrictions must be relaxed" and parties agreed to order that relaxed statutory signature requirements and extended deadline); *Acosta v. Restrepo*, No. 1:20-CV-00262-MSM-LDA, 2020 WL

3495777, at *5 (D.R.I. June 25, 2020) (secretary of state proposed measure whereby voters could execute petitions remotely). In another, the court held that a state's restrictions were not narrowly tailored because the state had conceded that it could still protect its interests through narrower means. *See Constitutional Party of Virginia*, 2020 WL 4001087, at *6 (noting that, "at trial, defendants recognized [that plaintiffs were virtually excluded from the ballot] and proposed more narrow means by which they [could] protect their interests"). Neither of those circumstances is present here. The Plaintiff cites no case in which a federal court enjoined enforcement of a state's numerical signature requirement over the state's opposition and after the state had already modified its requirements.

Based on the record before me, I cannot say that the Plaintiff is likely to succeed on her claim that Maine's ballot access requirements, considered together, are unconstitutional as applied in this context.

## II.   Remaining Factors

Although the likelihood of success on the merits is the most important of the four factors used in evaluating a motion for a temporary restraining order, I will briefly discuss the remaining factors.

First, I consider the irreparable harm to the Plaintiff if I decline to enter a temporary restraining order reducing the number of signatures needed for her to appear on the ballot. To date, on this record, Ms. Bond has collected approximately 2,700 signatures of registered voters on her petitions. Packard Decl. ¶ 29. Accordingly, the irreparable harm to Ms. Bond if no injunction issues is that her name will not appear on the general election ballot in November.

31

Next, I consider the balance of the hardships on the parties. The significant hardship to Ms. Bond outlined above must be balanced against the hardship to the State—and relatedly to the public—if the preliminary injunction were granted. *See Nken*, 556 U.S. at 435 (harm to opposing party and public interest merge when government is party). Weighed against Ms. Bond's burden is Maine's important interest of ensuring that candidates appearing on the ballot have a "significant modicum of support." *Jenness,* 403 U.S. at 442; *Am. Party of Tex.*, 415 U.S. at 782; *see also Munro*, 479 U.S. at 194. In this case, the requirement of 4,000 voters' signatures for non-party candidates, which is only .38 percent of Maine registered voters, allows the State to protect its interests in treating all minor party candidates fairly and in the enforcement of its statutory scheme. 21-A M.R.S.A. § 354. The extraordinary remedy that Ms. Bond seeks—ballot access without the showing of support—would threaten the State's ability to protect these important interests and would result in the discriminatory treatment of other minor or non-party candidates. Maine's petition signature requirements, as modified by Executive Order 39, serve important state interests and justify the reasonable, nondiscriminatory requirements to appear as a candidate for United States Senate on the general election ballot.

In addition, the public has a strong interest in ensuring that non-party candidates have clear methods for getting their names on the ballot. The signature requirement Ms. Bond seeks to alter has been a part of Maine's electoral landscape for over thirty years. *See* 21-A M.R.S.A. § 354; *Stoddard*, 593 F. Supp. at 302 (discussing requirement of 4,000 signatures for non-party candidates). This

requirement reflects a considered judgment about how best to ensure that candidates on the general election ballot have a minimum but measurable level of support from Mainers, while ensuring the integrity of the election process. The public and the State have a strong interest in the continued adherence to the numeric signature requirement, even during the challenging times presented by the COVID-19 pandemic. *See Libertarian Party of Conn.*, 2020 WL 3526922, at *14; *Hunter*, 635 F.3d at 243. Although I "acknowledge[ ] the realities and the added difficulties on the ground due to the COVID-19 pandemic," maintaining Maine's signature requirement for non-party candidates is in the public interest. *Libertarian Party of Pa. v. Wolf*, No. 20-cv-2299, 2020 U.S. Dist. LEXIS 124200, at *43–44 (E.D. Pa. July 14, 2020) (explaining that "[e]nforcing a signature collection requirement also furthers the state's interest in an orderly and transparent election process").

The Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020). While the general election is a little over three months away, slashing the numerical signature requirement—after the submission deadline has already passed—would be "altering state election rules in a way that goes beyond the court's role." *Libertarian Party of Pa.*, 2020 U.S. Dist. LEXIS 124200, at *44–45; *see also Esshaki v. Whitmer* (*Esshaki II*), —— F. App'x ——, 2020 WL 2185553, at *2 (6th Cir. May 5, 2020) ("[F]ederal courts have no authority to dictate to the States precisely how they should conduct their elections.").

33

## CONCLUSION

For the reasons stated above, I **DENY** the Plaintiff's emergency motion for injunctive relief and I **DENY** the Plaintiff's request for a hearing.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 24th day of July, 2020.